# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JACQUAR STOKES, *et al*.        :
    Plaintiffs,             :
                            :
    v.                       :       **CIVIL ACTION NO. 21-CV-1435**
                            :
BLANCHE CARNEY, *et al*.       :
    Defendants.            :

## MEMORANDUM

RUFE, J.                                **SEPTEMBER  29, 2021**

The Complaint in this case was submitted by several prisoners, challenging conditions at the Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia where they were all incarcerated and asserting claims under 42 U.S.C. § 1983. Three of those prisoners have indicated their intention to proceed with their claims.  Upon review of the Complaint, the Court concludes that this case may not proceed as a class action and will sever the individual claims of those three prisoners so that each Plaintiff may proceed separately in his own case.  Stokes, whose claims may proceed in this case, will be granted leave to proceed *in forma pauperis*.  The Court will dismiss certain of Stokes's claims without prejudice and permit his remaining claims to proceed at this time should he opt not to file an amended complaint.

## I.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

The Complaint, which is partially styled as a class action, lists four individual Plaintiffs, (ECF No. 4 at 6),[1] but six prisoners submitted individualized declarations that are hand signed in accordance with Federal Rule of Civil Procedure 11 — Jacquar Stokes, Jeffery Cardona, Kelly Gibson, Nicholas Fuentes, Ricardo Duplessis, and Darius Williams.  Each of these declarations

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

provides an individualized description of events allegedly experienced by the prisoner who authored it.  However, at the outset of this case, only Stokes, who was transferred to Norristown State Hospital shortly after submitting the Complaint, filed a Motion to Proceed *In Forma Pauperis* and a copy of his Prisoner Trust Fund Account Statement.  (*See* ECF Nos. 1 & 2.)   In a June 8, 2021 Order, the Court directed any prisoner who sought to proceed on his claims to file a motion for leave to proceed *in forma pauperis* with a copy of his prisoner account statement in accordance with 28 U.S.C. § 1915(a)(2) or, alternatively, to submit the fees for proceeding with this case.  (ECF No. 6 at 1.)  The Court also noted that "[o]nce it is known which Plaintiffs wish to pursue claims, the Court will determine whether the claims arise from separate occurrences and require separate proof of the events and any damages" such that joinder is impractical.  (*Id.* at 1 n.1.)

The copy of the Order sent to Stokes was returned as undeliverable, apparently because it was mailed to his address at CFCF rather than his updated address at Norristown State Hospital. (ECF No. 7.)  The Court will resend a copy of the Order to Stokes at his current address so that he has it for his records; the Order did not require Stokes to submit additional documents to the Court to proceed on his claims, so he was not prejudiced by the error.  (*See id.* at 3.)  Cardona responded to the Order by filing a Motion to Proceed *In Forma Pauperis*, a Prisoner Trust Fund Account Statement, and a Declaration in support of his Motion.  (ECF Nos. 8-10.)  Duplessis paid the filing fee and administrative fee in full.  The other three prisoners — Gibson, Fuentes, and Williams — did not respond to the Order, so they will be dismissed as parties to this case.

The Complaint names the following Defendants:  (1) O. Ford; (2) C/O Antwi; (3) Blanche Carney; and (4) Capt. Harmer.  (ECF No. 4 at 2-4.)  Carney is the Commissioner of the Philadelphia Department of Prisons and the other Defendants are employed at CFCF.  (*Id.* at 3-

4.)  Page six of the Complaint lists six additional Defendants:  (1) C/O M. Friend; (2) Sgt.

Brown; (3) "Oliver ___ H"; (4) Lt. Reid; (5) Sgt. John Doe; and (6) C/O Felts.  (*Id.* at 6.)  The

Defendants are sued in their individual and official capacities.  (*Id.*)

### A.  Putative Class Allegations

Plaintiffs, who are identified as pretrial detainees except for Cardona, who is a convicted

and sentenced state prisoner (*id.* at 5), are pursuing this case as a putative class action raising

claims for violation of their due process rights, excessive force, deliberate indifference and

"collusion."  (*Id.* at 4.)  They allege that "as a result of the customs, policies, practices and

actions adopted and undertaken by" Defendants, they were placed on a "segregation-detention

unit" identified as A-1-3 "and subjected to punitive status without receiving a disciplinary

hearing in violation of due process."  (*Id.* at 6.)  They also allege that they were assaulted by

correctional officers before they were housed on A-1-3 and subjected to unconstitutional

conditions on the unit.[2]  (*Id.*)

Plaintiffs indicate they are bringing claims "on behalf of themselves as well as any and

all other similarly situated individuals incarcerated at CFCF and housed on A-1-3."  (*Id.*)

Although the Complaint contains some common references to general conditions at CFCF, the

Plaintiffs have each provided a handwritten account of the allegations that pertain to them, which

---

[2] Plaintiffs also allege that they were "subjected to 24 hr. lockdown periods" despite a settlement order entered in *Remick v. City of Philadelphia*, Civ. A. No. 20-1959 (E.D. Pa.).  In *Remick*, the members of the putative class sought declaratory and injunctive relief, as well as habeas corpus relief, arguing that the conditions of confinement in the Philadelphia Department of Prisons' facilities created a heightened and unreasonable risk of COVID-19 for any confined person.  (*See* Civ. A. No. 20-1959, ECF No. 1.)  Judge Schiller has entered a series of partial settlement orders in the case, which remains pending.  Whether the City of Philadelphia has complied with those orders is a matter for Judge Schiller to address in the context of that case.  *See Smith v. Meyers*, 843 F. Supp. 2d 499, 505 (D. Del. 2012) ("The structure of the federal courts does not allow one judge of a district court . . . to deny another district judge his or her lawful jurisdiction.").

describe incidents that occurred at different times and involve different Defendants.    Each

prisoner's allegations are set forth in further detail below.

### B.  Stokes's Allegations

Stokes's claims stem from two primary incidents.  First, he alleges that on June 1, 2020,

during the intake process, Defendant Ford accused him of being in possession of heroin.  (*Id.* at

7.)  Stokes alleges that Ford alerted Defendants Friend and Brown that Stokes was in possession

of contraband, that Ford pepper sprayed him in the face and genitals, and that the three officers

wrestled Stokes to the ground and handcuffed him, but did not find any contraband.  (*Id.*)  Stokes

claims the pepper spray seeped into his urinary tract, causing an intense burning sensation, and

that he "complained about [his] genitals burning" for three weeks but was refused medical

attention.  (*Id.*)  He finally received medical attention on June 23, 2020, when he was prescribed

ciprofloxacin, but he claims he did not receive follow up care even though he submitted several

requests for medical appointments.  (*Id.*)

On June 8, Stokes submitted a memorandum to Defendant Reid, complaining about the

incident.  (*Id.*)  Also on that date, he was provided notice of disciplinary charges.  (*Id.*)

According to a report, Defendant Harmer found Stokes guilty on June 9 of violating a posted rule

or regulation, refusal to comply with an order, and disrespecting staff.  (*Id.*)  Stokes alleges that

the "report was served by COVID-19 hearings" (it is unclear what he means by this) and that the

information was "processed" by Defendant "Oliver__H."  (*Id.* at 8.)  Stokes was also informed

that he received a fifteen-day sentence in punitive detention for the violation and was provided

an appeal form.  (*Id.*)  He asserts that he "never received a statement of reasons regarding the

decision and [he] never received a disciplinary hearing."  (*Id.*)  Stokes appealed and expressed

his dissatisfaction with the process.  (*Id.*)

The second set of events that form the basis for Stokes's claims began on February 3, 2021.  On that date, Stokes saw Defendant John Doe facility sergeant and Defendant Antwi inside a cell with a naked inmate in view of a female supervisor, so he yelled "PREA" eight times as loud as he could.  (*Id.*)  Defendants Doe and Antwi emerged from the cell and ordered Stokes to "lock in."  (*Id.*)  Antwi also allegedly pepper sprayed Stokes and yelled "shut the fuck up.  You're a bitch."  (*Id.*)  Stokes broke away from Antwi and "ran to the front of the unit where [he] was handcuffed and beaten unconscious by approximately 8 different corrections officers." (*Id.*)  Stokes was taken to the hospital to treat his injuries and received x-rays and CAT scans. (*Id.*)  He suffered a fractured left forearm, a dislocated right shoulder, head trauma, back injuries, and other injuries including blurred vision and sensitivity to light.  (*Id.* at 9.)

Stokes alleges that when he returned to CFCF, he was housed on the punitive segregation unit (unit A-1-3) even though he had not received a disciplinary hearing.  (*Id.*)  He claims that other inmates were likewise housed there without having received a hearing and that they were being held on that unit indefinitely.  (*Id.*)  According to Stokes, "[t]he conditions on A-1-3 are horrible, we don't receive linen exchange, there is no access to the law library and we are locked inside of our cells 24 hrs. a day for several days at a time."  (*Id.* at 9.)  Stokes "notified" Carney "of this matter" on February 5, 2021.  (*Id.*)

### C.  Cardona's Allegations

Cardona, who was a convicted and sentenced inmate at the time of relevant events (*id.* at 5), asserts claims based on events that occurred in November 2020.  (*Id.* at 10.)  He alleges that he noticed other inmates looking at his naked body while he used the shower due to the lack of shower curtains.  (*Id.*)  Cardona spoke to Correctional Officer Felts and asked to speak to a supervisor about the shower issue and his concern that he was "housed in C.F.C.F. under

5

quarantine and not transferred directly to P.A.D.O.C." (*Id.*)  Cardona alleges that Felts rejected his request and assaulted him by "striking [him] with several blows which knocked [him] to the ground" and caused him to hit his head.  (*Id.* at 10-11.)  Felts allegedly continued to stomp and kick Cardona while he was on the ground until Cardona was unconscious.  (*Id.* at 11.)  Cardona claims he was then placed in solitary confinement without receiving medical attention and sent to A.1.3 without receiving a disciplinary hearing.  (*Id.*)  Cardona claims "[t]he conditions on A.1.3 are horrible, we are locked down 24 hours a day, no sheets or blanket exchange, no access to law library, no proper mental health assistance and the cells are always extremely cold."  (*Id.*)

He alleges that his rights have been violated because he is a state prisoner "illegally housed" within the Philadelphia Prison System.  (*Id.*)  Cardona also alleges that his Eighth Amendment rights were violated because he did not receive medical treatment and that his due process rights were violated because he did not receive a disciplinary hearing.  (*Id.*)

### D.  Duplessis's Allegations

Duplessis claims that on February 17, 2021, he was "ambushed" when Correctional Officers Nunes, Corley, Randall, and Petaccio, Sgt. Cherian, and Lt. Rodriguez[3] came to his cell upon learning Duplessis's cellmate was in possession of a cell phone.  (*Id.* at 12.)  Nunes and Cherian "forcefully had [Duplessis] up against the wall" while the other officers wrestled with the cellmate over the phone.  (*Id.*)  Officers indicated that they "found [the phone] on the floor damaged under [the cellmate's] bed."  (*Id.*)  At that point, both Duplessis and his cell mate were removed from the room and strip searched by the officers.  (*Id.*)  While naked, Duplessis was ordered to "use each hand to hold a cheek and to squat and cough 3 times."  (*Id.*)  He was then ordered to "turn around, raise [his] private, and lift one leg up at a time."  (*Id.*)  Officers then

---

[3] None of these individuals are identified as Defendants in the Complaint.

searched the cell, and Officers Randall and Corley took Duplessis's commissary items worth $238.93. (*Id.* at 13.)

Thereafter, Duplessis claims he was placed in "arbitrary detention" by Sgt. Cherian even though he did not receive a disciplinary hearing. (*Id.*) Duplessis was required to serve 30 days in solitary confinement, followed by "administration," at which point his privileges of commissary, phone calls, and visits would be renewed. (*Id.*) He states that, "[w]hile on the arbitrary detention the conditions are horrible with limited access to linen exchange, laundry, law library and etc. You are in your cell 24 hrs. a day for days at a time." (*Id*. at 13.) Duplessis alleges that he "notified" Commissioner Carney and Warden Gianetta "of this matter" on February 19, 2021 by mail "with their Inmate Grievance form." (*Id.* at 14.)

### E. Additional Allegations

Although Gibson, Fuentes and Williams will be dismissed as parties to this case because they failed to respond to the Court's Order, the Court will recount their allegations because they are relevant to the class claims. Gibson's declaration describes events and conditions that occurred at another facility, the Philadelphia Industrial Correctional Center, beginning on August 1, 2020. (*Id.* at 15.) He then notes that he is currently housed on A.1.3 at CFCF indefinitely, and that the conditions "are deplorable, there is zero access to the law-library, zero sheet exchanges," inadequate mental health resources, and the inmates are "forced to stay inside of the cells for several days at a time." (*Id.* at 15-16.) Gibson alleges he notified Carney "of this matter." (*Id.* at 16.)

Fuentes alleges that on February 26, 2021, he was handcuffed, taken to the sally port, pepper sprayed in the face, and his face was slammed into the door. (*Id.* at 17.) He was also slammed on the floor and kicked in the back. (*Id.*) He does not identify the individuals who

treated him this way.  Fuentes was taken to the medical department, where he was only given water, and taken to A-1-3, where he was told a disciplinary hearing would be held outside his presence.  (*Id.*)  Like the other prisoners, Fuentes alleges that he is being held on the unit indefinitely, and that "[t]he conditions on A1-3 are deplorable, we have zero access to cleaning supplies, zero access of getting a sheet exchange, and zero access to the law-library."  (*Id.* at 18.)  He likewise claims that he "notified" Carney "of this matter."  (*Id.*)

Williams alleges that on January 17, 2021, he and his cell mate were removed from their cell because they were fighting.  (*Id.* at 19.)  He was strip searched and eventually "received a write-up with charges that I never would have known I had."  (*Id.* at 20.)  Williams alleges that he never received a hearing but was told he would have to spend sixty days in punitive detention. (*Id.*)  He alleges that the conditions on A-1-3 "are remarkably unfortunate.  The law library is currently inactive and has been like that for months.  We do not get sheet exchanges and rarely get a chance to come out our cell."  (*Id.*)  Williams alleges that although he was "given a write-up and date," he was not "given a hearing to fight the charges" and was improperly found guilty of them.  (*Id.*)

Plaintiffs requested class certification, $2 million in compensatory and punitive damages "for illegal placement in solitary confinement on A-1-3 during COVID 19 pandemic with no due process hearing" and "immediate release" from A-1-3 so they may be housed in the general population.  (*Id.* at 21.)

## II.     STANDARD OF REVIEW

Section 1915A requires that the Court "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."  28

U.S.C. § 1915A(a); *see also Brown v. Sage*, 941 F.3d 655, 660 (3d Cir. 2019) (*en banc*). In doing so, the Court must dismiss a complaint or any portion thereof that "is frivolous, malicious, or fails to state a claim upon which relief may be granted," 28 U.S.C. § 1915A(b)(1), or that "seeks monetary relief from a defendant who is immune from such relief," *id.* § 1915A(b)(2).

Whether a complaint fails to state a claim under § 1915A(b)(1) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Neal v. Pa. Bd. of Prob. & Parole*, No. 96-7923, 1997 WL 338838, at *1 (E.D. Pa. June 19, 1997); *see also Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999). Accordingly, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "'At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'" *Shorter v. United States*, No. 20-2554, 2021 WL 3891552, at *5 (3d Cir. Sept. 1, 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678. As the Plaintiffs are proceeding *pro se*, the Court construes their allegations liberally. *Vogt v. Wetzel*, 8 F. 4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

## III. DISCUSSION

### A. Class Claims

There are several problems with this case proceeding as a class action. Initially, although *pro se* litigants who are not lawyers may represent themselves, they may not pursue claims on behalf of others, including a class of other inmates. *See Hagan v. Rogers*, 570 F.3d 146, 158-59

(3d Cir. 2009) ("[W]e do not question the District Court's conclusion that *pro se* litigants are generally not appropriate as class representatives."); *Lewis v. City of Trenton Police Dep't*, 175 F. App'x 552, 554 (3d Cir. 2006) (*per curiam*) ("Lewis, who is proceeding *pro se,* may not represent a putative class of prisoners.").  For this reason alone, the case cannot proceed as a potential class action.

In addition, Plaintiffs indicate they seek to bring claims for damages and injunctive relief "on behalf of themselves as well as any and all other similarly situated individuals incarcerated at CFCF and housed on A-1-3" apparently based on their placement on A-1-3 without a hearing (sometimes without an end date) and the conditions on the unit.  (*Id.* at 6.)  However, they also allege excessive force as a basis for their class claims, even though their allegations about the force used upon them do not concern conditions on A-1-3, and claim "collusion," although it is not clear what the Plaintiffs mean by this term, or how the putative class the Plaintiffs seek to represent correlates with the claims alleged.

Moreover, the Plaintiffs are not similarly situated — Stokes and Duplessis were pretrial detainees during the relevant events while Cardona was a convicted and sentenced inmate — and some of the claims may be governed by different legal standards. *See Wharton v. Danberg*, 854 F.3d 234, 247 (3d Cir. 2017) ("Our precedent is clear that while the detention of sentenced inmates is governed by the Eighth Amendment, the treatment of pretrial detainees is governed by the Due Process Clause" of the Fourteenth Amendment and "[t]he protections of the Eighth Amendment and Due Process Clause[] are sometimes, but not always, the same.") (citing *Bell v. Wolfish*, 441 U.S. 520, 551 (1979)).

Most importantly, the class claims are not adequately pled.  Primarily, the Complaint liberally construed pursues two themes common to the putative class of inmates "incarcerated at

CFCF and housed on A-1-3." First, the Plaintiffs appear to be asserting that Carney, in her individual and/or official capacity, maintained a custom of placing inmates at CFCF on A-1-3 indefinitely without providing them a hearing. Second, Plaintiffs appear to be asserting that Carney, in her individual and/or official capacity, permitted the conditions in which they are or were confined on unit A-1-3.

Official capacity claims are indistinguishable from claims against the entity that employs the officials, here the City of Philadelphia. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690, n. 55 (1978)). To maintain a claim against Carney, or any other Defendant, in their official capacity, Plaintiffs must plead a basis for municipal liability.

To plead a basis for municipal liability under § 1983, a plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights. *See Monell*, 436 U.S. at 694. "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009). "'Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "'Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). For a custom to be the proximate cause of an injury, a plaintiff must establish that the Defendant "had knowledge of similar unlawful conduct in the past, failed

to take precautions against future violations, and that its failure, at least in part, led to [the plaintiffs'] injury." *Id.* (internal quotations and alterations omitted).  In other words, "[c]ustom requires proof of knowledge and acquiescence by [a municipal] decisionmaker."[4]  *McTernan*, 564 F.3d at 658; *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1191 (3d Cir. 1995) (to establish municipal liability, the plaintiffs "must show that a policymaker for the Township authorized policies that led to the violations or permitted practices that were so permanent and well settled as to establish acquiescence").

Regarding claims for individual liability, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).   There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Id.*; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d

---

[4] A plaintiff may also state a basis for municipal liability by "alleging failure-to-supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to deliberate indifference to the constitutional rights of those affected."  *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019). None of these legal theories appear to be relevant here.

Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).

Although the Complaint generally invokes the standard for municipal liability in support of the class claims, (*see* ECF No. 4 at 6), Plaintiffs do not identify a specific policy to house inmates on the punitive detention unit indefinitely without a hearing or a specific policy pertaining to the conditions in which they were held. Rather, liberally construing their allegations, they appear to be asserting that there exists a custom of treating inmates in this manner because they were treated this way. In support, they have provided six declarations from inmates (the Plaintiffs who are proceeding and those who are not) attesting to their placement on A-1-3 without a hearing. Although most of the Plaintiffs claim they were not given an anticipated end date for their time on A-1-3, that was not universal — Stokes was informed he would be placed in punitive detention for fifteen days in June 2020, Duplessis was given a thirty-day sentence, and Williams was given a sixty-day sentence. Each inmate's declaration contains similar generalized allegations about the conditions on A-1-3, *i.e.*, that the conditions on the unit are deplorable because they do not have access to a law library or sheet exchange and have been confined to their cells for 24-hour periods, sometimes for days. Four of the declarations also generally allege that those inmates "notified" Carney of the "matter" or "matters."

The Plaintiffs' somewhat similar experiences over the course of eight months do not support the existence of a plausible municipal custom to deny hearings to inmates housed on A-1-3 at CFCF that essentially operates with the force of law because they have not adequately alleged knowledge or acquiescence attributable to the City. Four of the Plaintiffs generally allege that they notified Carney of the matter or matters, without specifying the particular issues that they brought to her attention. Their generalized allegations are insufficient to state a

plausible basis for Carney's personal involvement in, knowledge of, or acquiescence in the constitutional violations alleged, which is fatal to their individual and official capacity claims raised on behalf of the class.  *See Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (*per curiam*) (defendants' alleged inappropriate responses to plaintiff's "later-filed grievances" were insufficient to establish those defendants' personal involvement in underlying wrongs); *Rode,* 845 F.2d at 1207 ("Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."); *Burk v. Crowe*, Civ. A. No. 19-5792, 2020 WL 42758, at *4 (E.D. Pa. Jan. 3, 2020) (plaintiff's "general allegation that he 'wrote to' Crowe, Cassidy, Budd, and Lagana 'when this happen[ed]' is too vague and undeveloped to state a plausible basis for liability against these individuals").

   The same is true of Plaintiffs' class claims based on the conditions of A-1-3.  In addition, the generalized allegations about the conditions on A-1-3 are too vague to allege a plausible underlying constitutional violation.  Plaintiffs cite the general lack of access to a law library but there are no allegations that any of the prisoners suffered an actual injury by losing their ability to pursue a nonfrivolous claim.  *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (explaining that the right of access to the courts, "rest[s] on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court"); *O'Connell v. Williams*, 241 F. App'x 55, 57 (3d Cir. 2007) (*per curiam*) (holding that "[t]o state a claim for denial of access to courts based on an inadequate law library, a litigant must show with specificity that he was prevented from litigating a nonfrivolous underlying claim due to the allegedly inadequate facilities, and must seek a remedy for the denial of access which would not be available in another suit").  While denial of recreation and clean facilities may rise to the level of a constitutional violation, the conditions

14

must be objectively serious and prison officials must have acted with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (to act with deliberate indifference, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); *Stevenson*, 495 F.3d at 68 (explaining that unconstitutional punishment involves objective and subjective components; the "objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind."); *Edwards v. Northampton Cty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (per curiam) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners and pretrial detainees." (internal citations omitted)).  Plaintiffs allege that they are not able to regularly exchange their sheets, some allege that they are locked in their cell for days at a time (although the frequency or duration of these periods is unclear), and some allude to inadequate mental health resources.  However, Plaintiffs have offered at most only one or two sentences of undeveloped allegations about the conditions on A-1-3.  They have not alleged sufficient facts about the extent, duration, and effect of those conditions from which this Court could infer that the challenged conditions were objectively serious, such that inmates housed on A-1-3 were deprived of a basic human need or that their health or safety was at risk.  *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."); *Bell v. Wolfish*, 441 U.S. 520, 542 (1979) (indicating that conditions must result in "genuine privations and hardship over an extended period of time" to violate the Constitution).  In other words,

Plaintiffs have not only failed to allege a municipal policy or custom, but they have also failed to allege plausibly that the conditions on A-1-3 violated the Constitution.

For all of these reasons, the class claims are dismissed.  This leaves the individual claims of Stokes, Cardona, and Duplessis.

### B.  Misjoinder and Severance

Beyond the claims grounded in the class allegations, Stokes, Cardona and Duplessis's individual claims are based on different events involving different Defendants.  Federal Rule of Civil Procedure 20 allows the joinder of multiple plaintiffs in one action if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and the action involves "any question of law or fact common to all plaintiffs."  "For courts applying Rule 20 and related rules, 'the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.'"  *Hagan v. Rogers*, 570 F.3d 146, 153 (3d Cir. 2009) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966)).

"But this application, however liberal, is not a license to join unrelated claims and [parties] in one lawsuit." *McKinney v. Prosecutor's Office*, Civ. A. No. 13-2553, 2014 WL 2574414, at *14 (D.N.J. June 4, 2014) (internal quotations omitted).  To remedy a misjoinder, a Court may add or drop a party or sever any claims.  Fed. R. Civ. P. 21.  "A district court has broad discretion in deciding whether to sever a party pursuant to Federal Rule of Civil Procedure 21." *Boyer v. Johnson Matthey, Inc.*, Civ. A. No. 02-8382, 2004 WL 835082, at *1 (E.D. Pa. Apr. 16, 2004).

The only allegations common to all three Plaintiffs are their individual allegations mirroring those they attempted to raise on behalf of the class regarding the alleged custom of holding inmates on A-1-3 without a hearing and based on the conditions on the unit.  Leaving those aside, Stokes raises allegations against the Defendants (except for Felts) based on:  (1) events that occurred in June 2020 involving the use of pepper spray on him, the alleged denial of treatment for harm suffered as a result of exposure to the pepper spray, and his fifteen-day placement in disciplinary detention without a hearing; and (2) events stemming from a February 3, 2021 incident during which he was beaten and then placed on unit A-1-3 indefinitely without a hearing.  The only Defendant mentioned in Cardona's declaration is Felts, who allegedly beat Cardona to the point of unconsciousness on November 19, 2020, and who is not alleged to have been involved in the events giving rise to Stokes's claims.  Duplessis's allegations do not mention any of the individuals named as Defendants in the Complaint apart from Carney, but describe events involving other correctional officials and prison staff who caused Duplessis to be strip searched and placed on unit A.1.3 without a hearing.

Although these events all took place at the same facility, none of the claims based upon these events arise out of the same transactions or occurrences because they involved different individuals, occurred at different times, and concern distinct events.  Even though the individual claims based on the same allegations as the class claims could be said to relate to each other regarding the subject matter and legal analysis, the majority of the Plaintiffs' individual claims are sufficiently disparate that joinder is improper.  *See Boretsky v. Governor of N.J*, 433 F. App'x 73, 77 (3d Cir. 2011) (*per curiam*) ("Although some of the plaintiffs' claims might ordinarily be good candidates for joinder, we cannot say that, given the hodgepodge of claims raised in the original complaint, the District Court abused its discretion in dismissing Boretsky's

co-plaintiffs from the action and directing the plaintiffs to file separate complaints"). Accordingly, the Court will address Stokes's claims in this lawsuit and sever Cardona and Duplessis's claims so that they may proceed in separate lawsuits.[5]

### C. Stokes's Claims[6]

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). For the following reasons, the Court can only discern three claims upon which Stokes may proceed; his remaining claims are not plausible as pled and will be dismissed without prejudice.

#### 1. Official Capacity Claims and Claims Against Carney

The Court understands Stokes to be raising claims against the Defendants in their official capacities and against Carney in her individual capacity based on alleged municipal policies or customs that caused the constitutional violations alleged in this case. However, these claims fail for the same reasons the class claims fail. *See supra* § III.A. Stokes has not plausibly alleged that any of the constitutional violations at issue stemmed from a municipal policy or custom, nor has he adequately alleged Carney's personal involvement in any of the claimed violations. He has also failed to state a plausible constitutional violation based on his generalized allegations

---

[5] Since the Plaintiffs will be proceeding in their own lawsuits, the Court will attribute Stokes and Cardona's Motions to Proceed *In Forma Pauperis* to their lawsuits and will attribute Duplessis's payment to his lawsuit. The Court will not screen Cardona and Duplessis's individual claims because of the decision to sever the claims; rather, those claims may be screened after severance.

[6] As noted above, Stokes moved to proceed *in forma pauperis* at the outset of this case. The Court will grant that Motion because it appears that Stokes is not able to pre-pay the fees to commence this action. However, since Stokes is a prisoner, he will be obligated to pay the fee in installments pursuant to 28 U.S.C. § 1915(b).

about the conditions on A-1-3, as discussed above.  *Id.*  Accordingly, the Court will dismiss these claims as implausible and address Stokes's remaining claims below.

### 2.  Claims Based on Events in June 2020

The Court understands Stokes to be raising the following claims based on the events in June 2020:  (1) excessive force claims against Defendant Ford for pepper spraying him in the face and genitals after accusing him of being in possession of heroin, and against Defendants Friend, Brown and Ford for wrestling him to the ground and handcuffing him; (2) a claim for deliberate indifference based on his allegations that he did not receive proper medical attention for injuries he suffered as a result of being pepper sprayed; and (3) due process claims based on allegations he was charged with disciplinary infractions and placed in punitive detention for fifteen days without a hearing or an explanation.

### a.  Excessive Force

Since Stokes was a pretrial detainee during the relevant events, the Due Process Clause of the Fourteenth Amendment governs his excessive force claim.  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  To state a due process violation based on excessive force, a detainee must allege facts to suggest plausibly that "that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used:  the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Id.*

Stokes alleges that Ford pepper sprayed him in the face and genitals, apparently because Ford believed Stokes was in possession of contraband.  Stokes also claims that he was injured because his genitals burned for several weeks.  Although the Complaint is sparse on additional details, Stokes has alleged a sufficient basis from which the Court could infer that Ford used excessive force on Stokes in this situation, so this claim will be permitted to proceed against Ford in his individual capacity at this time.  Any claims against Ford in his official capacity based on this incident will be dismissed because Stokes has not alleged a municipal policy or custom that caused this alleged constitutional violation.  *See supra* § III.A & III.C.1.

However, the Complaint does not state an excessive force claim against Defendants Friend and Brown.  Those Defendants are alleged to have "wrestled" Stokes to the ground and handcuffed him after having been informed by Defendant Ford that Stokes was in possession of heroin, apparently so they could search him for contraband.  The facts alleged, taken as true, do not allege a plausible claim since they do not suggest that the amount of force that Friend and Brown used to detain him was objectively unreasonable based on their interest in detaining him so that they could confirm whether he was in possession of heroin and, hence, a serious security risk.  Additionally, Stokes does not allege that he was injured in any way as a result of Friend and Brown's conduct.  The Court will therefore dismiss without prejudice the claims against Friend and Brown in their individual and official capacities.

### b.  Deliberate Indifference to Medical Needs

To state a claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.  *See Farmer*, 511 U.S. at 835.  "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily

recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

Stokes alleges that he complained about his genitals burning for three weeks without receiving any medical attention and that, although he was finally prescribed ciprofloxacin, he did not receive any follow up are thereafter. (ECF No. 4 at 7.) However, Stokes does not tie this allegation to any of the named Defendants. He notes, following an allegation about the absence of follow up care, that on June 8, 2020 he submitted a "Phila. Prison System Memorandum" to Defendant Lt. Reid "regarding the incident and expressed [his] intent to speak with internal affairs" (ECF No. 4 at 7), but it is not clear what the content of this memorandum was, that this allegation relates to medical issues, or how this allegation would translate into a claim against Defendant Reid for deliberate indifference or any other constitutional violation. Accordingly, Stokes has not stated a basis for a claim against any of the Defendants for deliberate indifference to his medical needs.

### c.  Due Process

The United States Court of Appeals for the Third Circuit has noted that, "[g]enerally, prisons may sanction a pretrial detainee for misconduct that he commits while awaiting trial, as long as it is not a punishment for the 'underlying crime of which he stands accused.'" *Kanu v.*

*Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018) (quoting *Rapier v. Harris*, 172 F.3d 999, 1003-06 (7th Cir. 1999)).  However, while "'pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in [disciplinary segregation] without explanation or review of their confinement.'" *Singleton v. Superintendent Camp Hill SCI*, 747 F. App'x 89, 92 (3d Cir. 2018) (*per curiam*) (quoting *Bistrian v. Levi*, 696 F.3d 352, 375 (3d Cir. 2012)).  With respect to pretrial detainees, "the imposition of disciplinary segregation for violation of prison rules and regulations cannot be imposed without providing the due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 . . . (1974)." *Kanu*, 739 F. App'x at 116.  Such protections "include the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence." *Id.* (citing *Wolff*, 418 U.S. at 563-66); *see also Stevenson v. Carroll,* 495 F.3d 62, 70 (3d Cir. 2007).  Moreover, "the filing of a fraudulent misconduct report and related disciplinary sanctions do not without more violate due process," *Seville v. Martinez,* 130 F. App'x 549, 551 (3d Cir. 2005) (per curiam), because "[d]ue process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly false misconduct reports," *Thomas v. McCoy*, 467 F. App'x 94, 97 (3d Cir. 2012) (per curiam); *see also Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) ("[S]o long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim.").

Stokes alleges that he was found guilty of disciplinary infractions and sentenced to fifteen days in punitive detention without receiving a hearing or an explanation of reasons supporting the disciplinary decision.  (ECF No. 4 at 7-8.)  These allegations state a plausible basis for a due

process violation against Defendant Harmer, who is alleged to have rendered the disciplinary decision without affording Stokes an opportunity to respond to the charges.  (*Id.* at 7.)  However, Stokes has not adequately alleged that any of the other Defendant involved in the events in June 2020 violated his due process rights.  Although he alleges that Defendant Oliver___H "processed" the report reflecting Harmer's decision, simply processing a report about the underlying events does not establish personal involvement in the alleged constitutional violation. In sum, Stokes may proceed at this time on his due process claim against Defendant Harmer based on his fifteen-day placement in punitive detention, but if he intended to bring due process claims based on these events against any other Defendants, those claims are dismissed.

### 3.   Claims Based on Events in February 2021

The Court understands Stokes to be raising the following claims based on the events in February 2021:  (1) excessive force claims based on allegations that he was pepper sprayed and beaten unconscious; and (2) due process claims based on his allegations that he was housed in punitive segregation indefinitely without a hearing when he returned from the hospital.

### a.   Excessive Force Claims

Stokes alleges that after he yelled "PREA" eight times, Defendant Sgt. John Doe ordered him to "lock in" and Defendant Antwi pepper sprayed him.  He alleges that he "broke away" from Antwi and ran to the front of the unit, where he was handcuffed and beaten unconscious by approximately eight correctional officers, causing him several injuries that required treatment at a hospital.  The Court cannot discern any plausible constitutional violation committed by Sgt. Doe, who is alleged only to have ordered Stokes to "lock in."  Accordingly, the individual and official capacity claims against this Defendant will be dismissed.  Since Antwi is alleged to have pepper sprayed Stokes, apparently only for yelling "PREA," the excessive force claims against

Antwi will be permitted to proceed at this time, because these allegations raise a plausible claim that the use of pepper spray was excessive under the circumstances.  *See Kingsley*, 576 U.S. at 396-97.

Although Stokes has stated a plausible basis for an excessive force claim based on his allegation that eight officers beat him to the point where he lost consciousness, he did not name any of these officers as Defendants or tie these allegations to the named Defendants, so any claims based on the beating will be dismissed.  Additionally, since the Complaint does not adequately allege that a municipal policy or custom caused this constitutional violation, any official capacity claims, including the official capacity claims against Antwi, will be dismissed. *See supra* § III.A & III.C.1.

### b. Due Process Claims

Stokes alleges that when he returned from the hospital, he was housed on the punitive segregation unit without receiving a disciplinary hearing and without being given an anticipated release date.  Although these allegations could state a plausible due process claim, Stokes has not adequately tied them to any of the named Defendants.  In other words, he has not adequately alleged that any of the Defendants were personally involved in the events that led to his alleged indefinite placement in punitive detention without a hearing nor has he adequately alleged that this violation was caused by a municipal policy or custom.  *See supra* § III.A & III.C.1. Accordingly, claims based on Stokes's placement in punitive detention beginning in February of 2021 will be dismissed without prejudice.

### IV.     CONCLUSION

For the foregoing reasons, the Court concludes that:  (1) Plaintiffs Gibson, Fuentes and Williams will be dismissed as parties to this case due to their failure to either pay the fees or seek

leave to proceed *in forma pauperis* in response to the Court's prior Order;[7] (2) the Complaint does not adequately plead class claims and, even if it did, the *pro se* Plaintiffs may not represent a class of prisoners, such that any class claims will be dismissed; (3) the individual claims of the remaining Plaintiffs — Stokes, Cardona and Duplessis — are improperly joined and will be severed so that these Plaintiffs may proceed in their own individual cases, with Stokes proceeding in this case; and (4) Stokes will be granted leave to proceed *in forma pauperis*, certain of his claims will be dismissed, and he may proceed on three remaining claims. Regarding Stokes's claims, he may proceed on:  (1) his excessive force claim against Defendant Ford in his individual capacity for pepper spraying him on June 1, 2020; (2) his excessive force claim against Defendant Antwi in his individual capacity for pepper spraying him on February 3, 2021; and (3) his claim against Defendant Harmer in his individual capacity for allegedly confining him to disciplinary segregation without due process in June of 2020.  All of Stokes's other claims will be dismissed as implausible with leave to amend.  Stokes will be given the option of proceeding at this time on the claims that the Court did not dismiss or filing a comprehensive amended complaint.  An appropriate Order follows, which in part provides further guidance to Stokes about his options for proceeding.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**

_____

**CYNTHIA M. RUFE, J.**

---

[7] The dismissal will be without prejudice to these prisoners' ability to file new civil actions on an individual basis if they seek to proceed with any of the claims they attempted to raise in this case.  The Court expresses no opinion on the merits of any such claims.